UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

United States of America

      CR-06-0810 (CPS)

  - against -

      MEMORANDUM OPINION
      AND ORDER

Tarik Williams,
                       Defendant.

----------------------------------------X

SIFTON, Senior Judge.

    Defendant Tarik Williams was indicted on December 8, 2006 on one count of knowingly and intentionally possessing a Keltec .380 caliber semi-automatic pistol, and ammunition, in violation of 18 U.S.C. §922(g)(1)[1] and 18 U.S.C. § 924(a)(2). Now before this Court is defendant's motion to suppress physical evidence and post-arrest statements, which was the subject of a hearing before

---

[1] The statute reads, in relevant part:

   (g) It shall be unlawful for any person--
   (1) who has been convicted in any court of, a crime punishable by
   imprisonment for a term exceeding one year;
   to ship or transport in interstate or foreign commerce, or possess
   in or affecting commerce, any firearm or ammunition; or to receive
   any firearm or ammunition which has been shipped or transported in
   interstate or foreign commerce.

   18 U.S.C. § 922(g)(1). Defendant was convicted in 2003 of criminal
   possession of a weapon in the second degree in violation of New York
   Penal Law 265.03(02), a crime punishable by a term of imprisonment of
   more than one year.

the undersigned on February 5 and February 6, 2007.[2] For the reasons stated below, this motion is granted. What follows sets forth the findings of fact and conclusions of law on which this determination is based.

**Background**

On the evening of September 11, 2006, three Police Officers, David Voyer, Wilson Sagardia and Sergeant Terrence Palusko, all members of a Brooklyn North Anti-Crime unit, were patrolling the 73rd and 75th precincts in an unmarked black Crown Victoria with tinted glass windows. According to the testimony of the officers, Officer Voyer was driving, Officer Sagardia was in the front passenger seat and Sergeant Palusko was in the rear passenger seat behind the driver. *E.g.* Sagardia Testimony, p. 5. All three officers were in uniform, with their official patches and shields displayed.

During their patrol, the officers were reassigned to the 81st precinct, also in Brooklyn, following reports of gunfire within that precinct, in order to provide "extra enforcement" in

---

[2] Although defendant pleaded guilty to a violation of his state parole subsequent to his arrest, the government does not argue that he is collaterally estopped from bringing his present motion. *Cf. U.S. v. Gregg,* 463 F.3d 160 (2d Cir. 2006).

the area. Sagardia Testimony, p. 19.[3]  At approximately 11:30 P.M. the defendant flagged down the officers from in front of his parents' building at 300 Vernon Street.  Defendant had been visiting his parents and was waiting for a livery cab he had called for from his parents' apartment.  When the defendant saw the unmarked police car approaching, he believed that it was the livery cab and ran outside.[4]

Upon seeing the defendant, the officers stopped the car a few feet past where he was standing and backed the car up. According to the officers' testimony, two of the officers, Sergeant Palusko and Officer Sagardia, got out of the car and approached the defendant, Palusko exiting nearest to the defendant from the back seat on the driver's side and Sagardia exiting from the front passenger seat. Palusko Testimony, p. 37.[5] Upon seeing the officers, the defendant registered surprise and,

---

[3] According to Officer Voyer, the redeployment was "a visibility thing to prevent retaliation if there happened to be [a shooting] or something of that nature." Voyer Testimony, pp. 69-70.

[4] According to Sergeant Palusko, he has been waved down before by people mistaking the unmarked vehicle for a livery cab. Palusko Testimony, p. 47.

[5] Although Officer Voyer stated that he remained in the car until the fight began and Officer Sagardia testified that only he and Sergeant Palusko intially left the car, Sergeant Palusko testified that when he left the car the other officers "followed" him and that they were "behind" him when he saw the defendant drop the bag of marijiuana. Palusko Testimony, pp. 37, 39; Sagardia Testimony, p. 8.

according to two of the officers,[6] dropped a thin, square clear plastic envelope containing a "green leafy substance," slightly larger than a postage stamp, from his left hand. Sagardia Testimony, p. 9; Palusko Testimony, p. 36. The bag was recognized as a "nickel bag" representing $5 worth of marijuana. Sagardia Testimony, pp. 62. Sergeant Palusko testified that he then asked the defendant if he had "anything else on him." Palusko Testimony, p. 40. According to Palusko, when the defendant did not respond, Palusko patted him down and detected a gun in the defendant's waistband. Palusko Testimony, p. 41. Palusko then removed the loaded Keltec .380 caliber pistol and alerted Officer Sagardia by code to the presence of a gun. When the defendant resisted being handcuffed, Officer Sagardia joined Sergeant Palusko in an effort to subdue the defendant and Officer Voyer, according to his testimony, got out of the car to assist his fellow officers. Voyer Testimony, p. 67. The three officers succeeded in subduing the defendant and arrested him. The defendant, Officer Voyer and Sergeant Palusko were all injured in the struggle.

The defendant testified at the hearing that he did in fact possess the gun and the marijuana. Williams Testimony, pp. 81-82.

---

[6] Both Palusko and Sagardia testified that they saw the defendant drop the bag. Voyer testified that he did not see the defendant drop the bag, which is consistent with his testimony that he was sitting in the car at the time. Voyer Testimony, p. 70.

However, according to the defendant, he did not drop the bag of marijuana. Rather, he testified that the bag was removed from a small change pocket on the front of his pants during a pat down which occurred immediately after the police exited the vehicle. Williams Testimony, p. 82. According to the defendant, an officer, whom he identified as Voyer, exited from the side of the vehicle nearest the defendant, approached him, and asked if he had a gun. Williams Testimony, pp. 81, 89. Defendant responded by lifting his sweatshirt and undershirt to show the officers that he did not. Williams Testimony, p. 83.[7] According to the defendant, the gun was clipped to his waistband, concealed inside the front of his pants and not visible, held in place by a thin tapered black metal clip, approximately two inches long by one quarter of an inch wide, attached to the gun's grip. Williams Testimony, pp. 81, 91; Government Exhibit SH-2. Voyer nevertheless began to pat the defendant down and immediately found the bag of marijuana. Williams Testimony, pp. 81. Voyer thereupon continued his pat down and found the gun. Williams Testimony, pp. 81, 89.

---

[7] The government has not argued that defendant's actions constituted consent to search. Nor has the government demonstrated by clear and convincing evidence that the defendant was acting freely and voluntarily. *See U. S. v. Mapp*, 476 F.2d 67, 77 (2d Cir. 1974); *U.S. v. Marotta*, 326 F.Supp. 377, 380 (S.D.N.Y. 1971). Defendant's decision to pull up his shirt upon confrontation by a uniformed police officer was, on the face of it, "mere acquiescence in a show of authority." *U.S. v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

Defendant was subsequently read his *Miranda* rights by detectives at the precinct, signed a waiver of those rights and was interrogated, after being held for several hours in a holding cell.[8] During that interrogation, defendant wrote out and signed a statement saying that he possessed "a gun a 380" on the night of the arrest and that he was carrying it because someone whom the defendant had previously shot had stated that he was going to retaliate. Government Exhibit SH 6. Police also seized $529 from the defendant, consisting of nine $1 bills, fourteen $5 bills, three $10 bills, eleven $20 bills, and two $100 bills. According to the defendant, the money represented a portion of his salary which he had left with his mother for safekeeping and which he had retrieved that night to pay his rent and buy gifts for his son's recent birthday; defendant testified that he was paid for his construction job in cash with whatever his employer had available and that he was not selling drugs. Williams Testimony, pp. 76-77, 86, 100.

**Discussion**

*Exclusionary Rule*

---

[8] The defendant testified that he did not recall being read his *Miranda* rights or signing a waiver, though he did not deny that he was read his rights and signed the waiver. Nor does he challenge the use of his statement on *Miranda* grounds.

Physical evidence derived from an illegal stop and frisk is excluded from use at trial, as are verbal statements, unless the prosecution can demonstrate that such statements were made voluntarily and not tainted by the illegal arrest. *Wong Sun v. U.S.*, 371 U.S. 471, 487-88 (1963); *Brown v. Illinois*, 422 U.S. 590, 603 (1975). According to defendant, the search in this case was unlawful and the gun, the marijuana and his post-arrest statement should be suppressed.

*Warrantless Searches*

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." *Katz v. U.S.,* 389 U.S. 347, 357 (1967). It is undisputed that the officers here did not have a warrant. However, under *Terry v. Ohio*, 392 U.S. 1 (1968), a police office may briefly stop an individual without first obtaining a warrant if the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." 392 U.S. at 30; *see U.S. v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (officer must have "reasonable suspicion" to perform a *Terry* stop). In

addition, the officer may "pat down" an individual "where he has reason to believe that he is dealing with an armed and dangerous individual . . . ; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27 (approving a pat down of the defendant's outer clothing). To determine whether an officer had reasonable suspicion, courts "assess the totality of the circumstances supporting the investigatory stop . . . . We make such an assessment in order to decide whether the officer's suspicion of wrongdoing has an objective and particularized basis." *U.S. v. Muhammad,* 463 F.3d 115, 121 (2d Cir. 2006).

Where probable cause to conduct a lawful arrest exists, police officers may perform a warrantless arrest and search incident to that arrest. *U.S. v. Robinson*, 414 U.S. 218, 235 (1973) ("in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment"). Probable cause is assessed from the perspective of "a reasonable and prudent officer in light of his training and experience," *U.S. v. Moreno*, 897 F.2d 26, 31 (2d Cir. 1990) (internal quotations omitted), and exists "when the

officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested." *U.S. v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983). Once probable cause exists, it does not matter whether the officers searched the defendant before or after the actual arrest. *U.S. v. Ricard,* 563 F.2d 45, 49 (2d Cir. 1977) ("The mere fact that the trooper reversed the procedure, conducting the search before the arrest, did not render it illegal as long as probable cause to arrest existed at the time of the search . . . . Any other holding would, without rational basis, exalt form over substance") (internal citations and quotations omitted).

If one or more of the police officers indeed witnessed the defendant drop the transparent bag appearing to contain drugs as they approached, that observation would be sufficient to establish both reasonable suspicion for a *Terry* stop and probable cause sufficient to justify the subsequent search.[9] *See U.S. v.*

---

[9] Defendant states that the search performed by the officers went beyond that permitted by *Terry* and constituted a "full seizure" which is only permitted where there is probable cause. There is no allegation that the officers did anything more than touch the outside of the defendant's clothing. According to the government, the officer "patted down the front waistband of the defendant's pants and felt what he immediately recognized as a gun." McGrane Affidavit, ¶ 3. Defendant does not dispute that characterization of the extent of the search, stating only that the officer's "patted him down." Harris Affidavit, ¶ 6. Such a pat down of the outer clothing is clearly the type of search permitted under

*Coley,* 66 Fed.Appx. 270, 272-273 (2d. Cir. 2003) ("informant's statements, along with the bag Defendant dropped [containing drugs], provided probable cause for the police to arrest Defendant"). Indeed, defendant does not argue that dropping a bag of drugs would not constitute reasonable suspicion and/or probable cause. Rather, defendant argues that since he did not drop any drugs in the first place, there was neither reasonable suspicion nor probable cause.

*Discovery of the Drugs*

"Once the defendant has established some factual basis for the motion [to suppress], the burden shifts to the government to show that the search was lawful . . . [by] a preponderance of the evidence." *U.S. v. Breckenridge*, 400 F.Supp.2d 434, 437 (D.Conn. 2005) (internal citations omitted). Having testified that he did not drop the bag of marijuana in view of the officers, the defendant has established a factual basis for his motion and shifted the burden to the government. Williams Affidavit, § 2.

The credibility of witnesses on a motion to suppress is for the district court hearing the testimony to determine. *U.S. v.*

---

*Terry* on the basis of reasonable suspicion, assuming the officers had previously seen the defendant drop the marijuana. *See Terry,* 392 U.S. at 27 (pat down of outer clothing permitted); *U.S. v. Mims,* 2005 WL 3466553, at *6 (D.Conn. 2005) (pat down of outer clothing is permissible where officer had reasonable fear for his safety).

*Vita,* 294 F.2d 524, 528 (2d Cir. 1961); *see also U.S. v. Dillon,* 1992 WL 97225, at *6 (N.D.N.Y. 1992) ("Having carefully reviewed all material factors, including the relative credibility and motivation of the witnesses, the court is convinced that agent Sandel's testimony and his supporting documentary evidence is more credible"); *U.S. v. Marrero,* 1991 WL 45058, at *3 (S.D.N.Y. 1991)(while "minor inconsistencies . . . are understandable with the passage of time and due to the large number of similar arrests made by the officer," direct contradictions are more "troubling").

In this case, the prosecution has not convinced me of the truth of the officers' account of the discovery of the marijuana. While the defendant alone testified that the packet of marijuana was in his change pocket and not thrown down or dropped, defendant's account of the evening, that he was not, as the government argues, selling drugs, but rather was visiting his parents to pick up cash to pay his rent and buy a belated birthday present for his son, was, in essential part, corroborated by his father who stated that his son was paid in cash for his construction job, that he kept money at his parents' apartment and that he had come by that night to get the money for rent. Thomas Testimony, pp. 113-114.  Both father and son have,

of course, a motivation to lie. However, so do the officers. Assuming the weapon was discovered as part of an illegal search, performed in response to reports of gunfire in the neighborhood, the need for a pretext to seize the gun may well have led to the invention of probable cause.[10]

Moreover, both father and son had substantial reasons to tell the truth. There is no reason to doubt that the oath meant something to the father, a law abiding workingman who maintained his serious and concerned demeanor through cross-examination. His son as well had strong reasons not to lie, if only to avoid a finding of perjury by the Court which, as he was cautioned before testifying, would in all likelihood be taken into account in sentencing, both as an obstruction of justice and as a failure to accept responsibility for his offense.[11]

---

[10] As the Supreme Court has noted, "[t]here are studies and commentary to the effect that the exclusionary rule tends to lessen the accuracy of the evidence presented in court because it encourages the police to lie in order to avoid suppression of evidence." *U.S. v. Janis,* 428 U.S. 433, 447 n. 18 (1976) (citing Comment, Police Perjury in Narcotics "Dropsy" Cases: A New Credibility Gap, 60 Geo.L.J. 507 (1971)); see also *U.S. v. Dunbar,* 470 F.Supp. 704, 708 (D.C.Conn. 1979) ("The 'plain view' principle has spawned numerous cases where the police officer says, "I saw him drop the package").

[11] The Court made clear to defendant and his counsel the sentencing consequences of submitting a false account of events, stating that:

> You know what this really comes down to, as I suppose everybody knows, is a sentencing issue if we ever get [to that stage]. That is, whether the defendant is going to have a more severe sentence imposed because the judge determines that he committed perjury in connection with the pretrial hearing . . . . where this will really become a live issue is whether to use any testimony

Aside from such traditional means of judging credibility, there are also substantial questions about the relative plausibility of each side's account.

Both sides agree that the defendant flagged down the undercover car under the mistaken impression that it was a livery cab. Why was he holding a small packet of drugs in his other hand? There is nothing to indicate that he was preparing to sell the drugs at the time he flagged down the car; there was no one near him on the street for him to sell to and Officer Sagardia testified that it did not appear that the defendant was trying to sell the drugs to him. Palusko Testimony, p. 51; Sagardia Testimony, p. 15. While it is conceivable that he was going smoke the drugs in the livery cab, as suggested by Sergeant Palusko, no rolling papers or other drug paraphernalia were found on his person to allow him to do so. Palusko Testimony, p. 38.

Other questions abound. Why would the defendant throw down the nickel bag of marijuana to prevent its discovery in a search

---

obtained under the circumstances as a sentencing factor.

Transcript of Oral Argument at 9-10, U.S. v. Williams, 06-CR-0810 (Jan. 25, 2007). Indeed, counsel for the defendant recognized this issue prior to this Court's warning and initially urged the Court to hold a hearing without an affidavit from the defendant, stating in the defendant's presence that "the reason why we make such a big deal about this obviously is that the government later really, in our view, tries to penalize a defendant for asserting their Fourth Amendment rights and requiring a full hearing by the various points under the guideline system." *Id.* at 5.

of his person knowing that the search was certain to reveal the much more serious firearm?

Officer Sagardia and Sergeant Palusko both testified to seeing the defendant drop the small, clear "zip-lock" bag containing a "green leafy substance" and to seeing him express "surprise" when he realized they were police officers. Sagardia Testimony, pp. 9, 23; Palusko Testimony, pp. 36, 39.[12] However, it is not at all clear how both could be in position to see the bag drop and the defendant's expression of surprise since Sagardia was approaching from the far side of the car, while Palusko approached from the driver's side, closer to the defendant. In addition, Palusko and Sagardia offer somewhat inconsistent descriptions of their respective positions; according to Palusko, he reached the defendant first and Sagardia was behind him as they approached, while Sagardia testified that they were side by side when the defendant dropped the bag. Palusko Testimony, p. 39; Sagardia Testimony, p. 14.

---

[12] The government argues that the defendant's identification of the officer who searched him as Voyer demonstrates, in the face of the testimony of the three officers to the contrary, that he was lying. However, if the defendant was incorrect in that identification, such a mistake would be reasonable given the passage of time and the fact that both Officer Voyer and Sergeant Palusko are white, heavyset, balding males who appear to be of similar ages. Nor does it appear that the defendant spent much time with either officer after the arrest, since Voyer and Palusko went to the hospital after dropping the defendant off at the precinct, where Officer Sagardia processed the arrest. Voyer Testimony, p. 108; Sagardia Testimony, p. 17.

Indeed, the entire account given by the officers is questionable. Why stop at all for a person mistakenly flagging down a car under the obvious misimpression that the unmarked black Crown Victoria with tinted windows was a livery vehicle?[13] And if the car stopped, as one of the officer's explained, to see if the individual needed assistance or to clear up the misunderstanding, why would two officers exit the vehicle and confront the defendant? Sagardia Testimony, pp. 21-22. On the other hand, the defendant's testimony that the officer approached him and immediately asked if he was carrying a weapon is consistent with the assignment of the three officers, who had been redeployed to the area in the wake of the shootings to provide "extra enforcement in the area." Sagardia Testimony, p. 19; Palusko Testimony, p. 34.

The government contends that the defendant's contention that he was searched twice, with the drugs found first and the gun later, is itself implausible. Why would the marijuana be found before the gun? The answer may lie in the fact that the gun was small and concealed in the defendant's crotch - an area of privacy to be avoided as part of the initial intrusion. Once the

---

[13] The officers' claim that they are frequently flagged down by those seeking assistance is questionable given the fact that there are no markings on the car to identify them as police officers to those seeking their assistance and the windows are tinted, making it difficult to identify the occupants as police officers.

officer found the drugs in the defendant's change pocket, it is plausible to conclude that he then continued his search and found the gun.

The government has, indeed, few reasons intrinsic to the defendant's account to question the defendant's credibility. The fact that $70 worth of $5 bills were found among the $529 of currency in the defendant's possession at the time of arrest does not come close to establishing the government's contention that the "nickel bag" in defendant's hand was the last bag of many he had been selling that evening. The asserted inconsistency of the defendant's testimony concerning the form waiver of rights and his handwritten confession presents, on examination, no inconsistency at all. The defendant, being inartfully asked, "Is it your statement that you didn't write this statement," answered "No." Williams Testimony, p. 98. The government's interpretation of this answer as a denial that the handwritten statement was made by the defendant is in any event contradicted by the defendant's clear statement immediately following, "I don't remember signing the document. I remember the statement." Finally, the government challenges the defendant's testimony that the gun clip would not have been visible when he lifted his shirt up. Given the size and width of the clip, it is entirely plausible that officers standing several feet away would not have

noticed the small, dark colored clip against the defendant's brown jeans.

Consideration of all of the circumstances, the demeanor of the witnesses, the many questions raised by the officers' account and the plausibility of the defendant's description of events lead me to the conclusion that government has not carried its burden.  Since on the defendant's account there was no legal ground for either the stop or the pat down, the products of the search must be suppressed; these include not only the marijuana and gun but also the defendant's statements, since once the products of the illegal search were discovered, the defendant could only feel obligated to admit the obvious.

**Conclusion**

For the reasons set forth above, the motion to suppress is granted.  The Clerk is directed to transmit a copy of the within to the parties.

SO ORDERED.

Dated :    Brooklyn, New York
           February 26, 2007

                By: /s/ Charles P. Sifton (electronically signed)
                              United States District Judge